AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Western District of Texas

**FILED**

July 26, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ SL
DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Saint Jovite Youngblood<br>aka Kota Youngblood | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

Case No. **1:23-mj-484-SH**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 2022 - May 2023_____ in the county of _____Travis_____ in the _____Western_____ District of _____Texas_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 1343 & 1956 | Wire Fraud and Money Laundering |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_Lindsey Wilkinson_
*Complainant's signature*

Lindsey Wilkinson, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____07/26/2023_____

*Judge's signature*

City and state: _____Austin, Texas_____

Susan Hightower, United States Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** § | **FILED UNDER SEAL** |
| § | |
| **vs.** § | |
| § | CRIMINAL NO. **1:23-mj-484-SH** |
| **SAINT JOVITE YOUNGBLOOD** § | |
| **aka Kota Youngblood** § | |
| § | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Lindsey Wilkinson, being duly sworn, state the following:

1.       I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2020. I am assigned to the FBI's San Antonio Field Office, Austin Resident Agency, White Collar Crime Squad where I investigate a variety of criminal matters including, but not limited to, wire fraud, complex financial crimes, money laundering, and other violations of federal law. Through my employment with the FBI, I have participated in all aspects of white collar investigations, including conducting surveillance, analyzing information obtained from court ordered warrants, and conducting investigative interviews.

2.       I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7); that is, I am an FBI Special Agent who is authorized by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.       This affidavit is submitted in support of my application for the issuance of a criminal complaint and arrest warrant against Saint Jovite Youngblood (Youngblood), a.k.a. Kota Youngblood, for violating 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956 (Money Laundering).

4.       This affidavit is based on evidence obtained by law enforcement during this

investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of the criminal complaint and arrest warrant that are sought, it does not contain every fact known to me or other law enforcement officers.

## PROBABLE CAUSE

5.     Since approximately April 2023, I have been involved in an investigation into criminal activity perpetrated by Youngblood. Based on the evidence gathered during the investigation, and as described herein, there is probable cause to believe that Youngblood has committed federal money laundering and fraud offenses.

6.     On April 27, 2023, VICTIM-1 reported to the FBI that he was the victim of a fraud scheme occurring between early 2022 and continuing to present day. During that time, VICTIM-1 made multiple payments by check and cash to the businesses owned or associated with INDIVIDUAL-1 [1] based on false statements made by Youngblood. Youngblood repeatedly extorted VICTIM-1, demanding money to protect VICTIM-1's family from a fictitious threat from "the Cartel," while also defrauding VICTIM-1 by making assurances that VICTIM-1's payments would simultaneously serve as an investment in valuable assets with high returning yields. A review of financial records obtained through Grand Jury Subpoenas show these payments were sent from VICTIM-1's company, BUSINESS-1, to INDIVIDUAL-1. Since July 2022, VICTIM-1 has paid Youngblood approximately $821,600 from his business account and from funds provided by VICTIM-2, VICTIM-3, and his parents. VICTIM-2 is romantically involved with VICTIM-1 and VICTIM-3 held a close professional working relationship with VICTIM-1.

---

[1] At Youngblood's direction, INDIVIDUAL-1 performed numerous acts in furtherance of Youngblood's illegal activities, including receiving money from VICTIM-1. Based on evidence obtained to date, investigators know that INDIVIDUAL-1 was a victim of one of Youngblood's prior fraud schemes and believe INDIVIDUAL-1 was likely an unwitting accomplice in the scheme perpetrated against VICTIM-1.

VICTIM-2 confirmed in an interview that she had provided a $60,000 loan from her business to VICTIM-1's business to help VICTIM-1.

7.      According to VICTIM-1, VICTIM-1 made these payments at the direction of Youngblood after Youngblood informed VICTIM-1 that VICTIM-1 and his family were targets of a drug Cartel and were in grave danger. Youngblood told VICTIM-1 that his ex-wife, WITNESS-1, was using and dealing drugs and had become involved with the Cartel. Youngblood told VICTIM-1 that WITNESS-1 was attempting to have VICTIM-1 killed to cash in on a $6.5 million life insurance policy VICTIM-1 held, of which WITNESS-1 was the named beneficiary. Youngblood instructed VICTIM-1 to provide funds to INDIVIDUAL-1 in exchange for Youngblood's purported protection of VICTIM-1's family.

8.      According to VICTIM-1, in late June 2022, Youngblood went to VICTIM-1's home and said VICTIM-1's son was in danger of being kidnapped and killed by the Cartel. Youngblood further told VICTIM-1 that he had proof, obtained from his friend at the NSA, of audio conversations between VICTIM-1's ex-wife and members of the Cartel hiring a hitman. Youngblood told VICTIM-1 he could help protect VICTIM-1 from the Cartel, but needed $70,000 to do so. VICTIM-1 agreed to pay Youngblood to protect his family. Youngblood instructed VICTIM-1 to write a check to INDIVIDUAL-1 and said INDIVIDUAL-1 could deposit and cash large checks without raising suspicion. INDIVIDUAL-1 was an antique clock business dealer who could deposit large checks for cash because of his business. Youngblood told VICTIM-1 his check would appear to be an investment in an antique clock, and that VICTIM-1 would receive a 30% return on his investment. Based on my training and experience, Youngblood's directions to send money through another entity to not raise suspicion is consistent with unlawful activity of money laundering by attempt to conceal the nature, location, source, or ownership of VICTIM-1's funds.

As described below, investigators have found no evidence corroborating any of Youngblood's claims, and believe them to be false.

9.      Following Youngblood's instruction, on July 8, 2022, VICTIM-1 wrote a check to INDIVIDUAL-1 for $70,000 from his Wells Fargo bank account for BUSINESS-1. The check (#2110) was made out to INDIVIDUAL-1 for "Kyle Project Services Rendered," per Youngblood's instruction. On the same day, INDIVIDUAL-1 deposited the check into his bank account with Wells Fargo. At the direction of Youngblood, INDIVIDUAL-1 then wrote a $70,000 check (#5710) made out to cash. A review of VICTIM-1 and INDIVIDUAL-1's bank account records obtained by Grand Jury Subpoena confirm these transactions. INDIVIDUAL-1 stated in an interview that he gave the $70,000 cash to Youngblood directly. VICTIM-1 made two additional payments to Youngblood through INDIVIDUAL-1 in July 2022: $86,000 on July 21, 2022 (check #2085) and $83,000 on July 27, 2022 (check #2086). Both payments were also directed by Youngblood, purportedly to protect VICTIM-1's family from an alleged Cartel threat.

10.     Audio recordings made by VICTIM-1 of conversations with INDIVIDUAL-1 and Youngblood corroborate VICTIM-1's statements. According to an interview with INDIVIDUAL-1, he was told by Youngblood of the dangers posed against VICTIM-1's family and instructed by Youngblood to receive money to mitigate the threat. In one recording, transcribed in part below, INDIVIDUAL-1 described an imminent danger to VICTIM-1's family that would be resolved by paying Youngblood:

> *VICTIM-1:* "I mean, are my children's lives in danger here? What am I dealing with, [INDIVIDUAL-1]?"
>
> *INDIVIDUAL-1:* "Everybody's lives are in danger here. This guy, this guy is, he's a spin-off of Los Zetas, but he is worse than they are, I'll just put it that way…They don't

like him, they know he is so dangerous."

*VICTIM-1:* "Well how is Kota [Youngblood] going to stop it then, I mean?"

*INDIVIDUAL-1:* "Well, once we pay this off, it takes everything— it's going to take everything's heat off, is my understanding. We can shut whoever is doing the posting— we'll be able to shut that person down is my understanding."

11.     The investigation has not revealed any legitimate threat of harm to VICTIM-1, INDIVIDUAL-1, nor any other victims by any Cartel or otherwise. Rather, victim and witness interviews show a pattern by Youngblood, extending back to at least 2010, of conducting fraud and extortion schemes using the threat of "the Cartel" or other dangers as a means to pressure victims into paying money and increasing their urgency to do so. According to multiple victims, Youngblood claimed to have previously been a member of the Special Forces in the U.S. military and to have ties to other government agencies. During a recorded conversation with an FBI Undercover Employee (UCE) on May 1, 2023, Youngblood told the UCE he currently "freelanced for the Department of Defense and solve problems all over the country" and had served in the military for 22 years including as Delta Force[2] for seven years and for the Army's 82nd Airborne. Record checks of U.S. military databases indicate Youngblood has never served in the U.S. military.

12.     In addition to the extortion and threats of Cartel violence, Youngblood made statements to VICTIM-1 that VICTIM-1's payments would serve a dual purpose as an investment in various business opportunities and return a large profit for VICTIM-1. As previously detailed,

---

[2] Delta Force, is one of the special missions units of the United States Army, and is commonly known as an elite military element. According to military.com, it is specifically directed to kill or capture high-value units or dismantle terrorist cells, but remains extremely flexible and can engage in direct-action missions, hostage rescues and covert missions working directly with the CIA, as well as high-ranking protective services of U.S. senior leaders during visits in war-torn countries.

Youngblood told VICTIM-1 that INDIVIDUAL-1 was an antique clock dealer and that VICTIM-1's payment would be an investment in an antique clock with a 30% return on investment. Similarly, Youngblood told VICTIM-1 he knew of valuable gold coins located out of the country and needed VICTIM-1's money to get them into the United States. Youngblood told VICTIM-1 they would split the proceeds from the sale of the gold coins and make a huge profit. Youngblood continued this practice of switching between extortion and investment schemes to extract more money from his victims. The investigation to date has revealed at least 22 victims, extending back to at least 2010, to whom Youngblood told intricate stories of investment opportunities or dangers posed that were often intertwined and difficult to keep straight.

13.     Throughout the course of VICTIM-1's payments to Youngblood, derogatory posts were published on multiple online platforms including Instagram/Facebook, Yelp, Twitter, DealerRater, and company websites. These posts made accusations of WITNESS-1's (VICTIM-1's ex-wife) alleged involvement in sex swinging groups and prolific use of drugs. Posts also accused VICTIM-1, WITNESS-1, WITNESS-2 (WITNESS-1's aunt), and other associated individuals and entities of working with the Cartel and laundering money. Since 2022, there have been more than 100 derogatory posts of this nature spread across social media platforms. I have reviewed screenshots of these posts captured by VICTIM-1, WITNESS-1, and WITNESS-3 (a personal friend of WITNESS-1). According to VICTIM-1, from July 2022 to May 2023, Youngblood continued to contact VICTIM-1 and said these posts were the Cartel's way of threatening VICTIM-1. After many of the posts, Youngblood would reiterate that VICTIM-1 needed to pay Youngblood to keep VICTIM-1's family safe from the Cartel and for the online harassment to stop. During an interview with VICTIM-4 (the son of INDIVIDUAL-1), he stated he had been directed by Youngblood to post the aforementioned negative posts. Youngblood told

VICTIM-4 his family was in grave danger and targeted by the Cartel and that creating these posts would protect VICTIM-4's family.

14.     As an example of the posts, on November 28, 2022, Yelp account "Bruce B." posted a one-star review on BUSINESS-2's Yelp page that said the following: "You can see my review of [BUSINESS-3] has a whole, but it has been ruined by the owner of [BUSINESS-2] and his flunkies who hit on under age girls and offer them drugs for sexual favors. [VICTIM-1], his woman [VICTIM-2], his ex [WITNESS-1], and [WITNESS-3] all are terrible people. Don't give this place any money!" Youngblood used these posts to further extort VICTIM-1 by telling him all these derogatory online posts would continue to surface unless VICTIM-1 paid him money to help make it go away.

15.     According to VICTIM-3, on October 7, 2022, VICTIM-1 asked VICTIM-3 to borrow $15,000 to pay Youngblood to keep VICTIM-1's family safe. VICTIM-3 gave VICTIM-1 $15,000 in cash. A review of screenshots from VICTIM-3's bank account shows a withdrawal of $15,000 on October 7, 2022. VICTIM-3 said he met with Youngblood on two occasions, and Youngblood told VICTIM-3 an elaborate story about why VICTIM-1 and his family were in serious danger.

16.     According to VICTIM-3, on October 28, 2022, VICTIM-1, VICTIM-3, and Youngblood met in the parking lot of the Grove Restaurant in Cedar Park, Texas. Youngblood told VICTIM-3 he needed $65,000 to protect VICTIM-1 and his family. Youngblood instructed VICTIM-3 to give the money to INDIVIDUAL-1. Following the meeting, VICTIM-3 went to Bank of America and purchased a Cashier's Check for $65,000 made payable to INDIVIDUAL-1. Later that day, VICTIM-3 met INDIVIDUAL-1 at The Field House in Cedar Park, Texas and gave INDIVIDUAL-1 a check for $65,000. A review of VICTIM-3's financial records show an

image of a Cashier's Check placed on October 28, 2022 at 3:27:17 PM in the amount of $65,000. The check was made payable to INDIVIDUAL-1 with the remitter listed as VICTIM-3. According to INDIVIDUAL-1, at Youngblood's direction, INDIVIDUAL-1 cashed the check and gave the cash to Youngblood.

17.    According to VICTIM-3, on November 3, 2022, VICTIM-1 asked VICTIM-3 for another $37,000 to pay Youngblood. VICTIM-3 went to a bank and obtained another Cashier's Check made payable to INDIVIDUAL-1 for $37,000. Later that day, VICTIM-3 met INDIVIDUAL-1 at the Bass Pro Shop in Round Rock, Texas and handed INDIVIDUAL-1 the $37,000 Cashier's Check. A review of VICTIM-3's financial records show an image of a Cashier's Check placed on November 3, 2022 at 1:24:59 PM in the amount of $37,000. The check was made payable to INDIVIDUAL-1 with the remitter listed as VICTIM-3. According to INDIVIDUAL-1, at Youngblood's direction, INDIVIDUAL-1 cashed the check and gave the cash to Youngblood.

18.    According to VICTIM-3, Youngblood showed up at his office on November 11, 2022 with an older man and attempted to give VICTIM-3 a baseball bat as collateral for VICTIM-3's "investment." Youngblood told VICTIM-3 the baseball bat had been the famous baseball player Lou Gherig's and was worth a lot of money. Youngblood said VICTIM-3 would receive more money back than he had put in if he continued to invest with Youngblood. VICTIM-3 told Youngblood he did not want the bat and did not have any more money to give. After this interaction, defamatory comments regarding VICTIM-3 and his business were posted on Yelp, Twitter, and other platforms. As an example, a post from Yelp user "Rich S." on BUSINESS-4's yelp page on April 29, 2023 said: "I'd choose this company over [VICTIM-3] any day of the week. [VICTIM-3] is a terrible person. He is currently going through a divorce from his wife. He was caught cheating on her with multiple men." The post went on to falsely describe VICTIM-1's involvement

with the Cartel saying, "VICTIM-1, his "ex-wife" [WITNESS-1], and… [WITNESS-3]… are in bed with The Cardenas faction of Los Zetas. They launder money, traffic narcotics, and provide a legitimate front to the cartel's illegal dealings." VICTIM-4 confirmed he had written these posts at Youngblood's direction after being told doing so would protect his own family from the Cartel. VICTIM-4 wrote these posts while residing in a temporary stay hotel room in Florida. VICTIM-3 maintained records related to his dealings with Youngblood including bank statements, screenshots of the social media posts, and personal notes. These items were provided to and reviewed by your Affiant and corroborated VICTIM-1 and VICTIM-3's interviews.

19.    In addition to the derogatory online posts, VICTIM-1 said he also received threatening phone calls from blocked numbers. On these calls, the caller would state that something bad would happen to VICTIM-1's family if he did not pay. The caller had the accent of an Asian woman. Youngblood told VICTIM-1 the caller was working with the Cartels and to take the calls seriously. In an interview, VICTIM-4's wife, VICTIM-5, stated she had made the threatening phone calls to VICTIM-1 at Youngblood's direction.VICTIM-5 further stated Youngblood provided the contact information and script for her to say and directed her to use a fake accent on the calls. VICTIM-5 placed these calls to VICTIM-1, who resided in Texas, from her cell phone while residing in Florida. VICTIM-5 said she placed these calls because Youngblood told her and her husband (VICTIM-4) that the Cartel would kill their family if they did not.

20.    On May 1, 2023, the FBI conducted an Undercover Operation (UCO) to observe and record Youngblood's attempts to extort and defraud VICTIM-1. Over the course of the UCO, Youngblood was recorded detailing the fictitious risk of violence to VICTIM-1's family and arranging further payment for continued protection of VICTIM-1's family from the Cartel. "I

consider these people dangerous," Youngblood told the Undercover Employee (UCE). Youngblood continued by saying he considered the involved Cartel faction to be the equivalent of El Chapo, the dangerous Cartel criminal. Youngblood then described an incident which he said occurred just the other day where some of the bad individuals involved threw a substance in his face that burned his skin and almost blinded him. Youngblood told the UCE that Youngblood's wife was a doctor and that she was terrified for Youngblood when she saw the burns.

21.     Youngblood explained to the Undercover Employee (UCE) over one recorded conversation that only half of a $12.2 million debt to the Cartel had been paid and that paying this debt off would keep VICTIM-1's family safe. Youngblood further explained to the UCE that if the UCE helped pay off the debt, the UCE would receive a large share of the profits from selling approximately 2,000 ounces in 70-kilogram gold bars which Youngblood had access to. Youngblood solicited the UCE to pay $76,000 immediately to keep VICTIM-1's family safe and to earn the share of the gold bars. "I will double your 76 [thousand dollars], plus a 25% share of what we have coming in," Youngblood said on one recording. Youngblood offered the UCE collateral for his payment of $76,000 in the form of an authentic Confederate era flag and the aforementioned alleged Lou Gherig baseball bat. Youngblood claimed the bat had been tested and confirmed to hold Gehrig's DNA and was very valuable. At the conclusion of their recorded meeting, Youngblood gave the UCE the described bat, stating it was wrapped in plastic to preserve the DNA. The bat was admitted into FBI evidence.

22.     According to VICTIM-1, Youngblood gave VICTIM-1 the aforementioned Confederate era flag as collateral for his investment, telling VICTIM-1 the flag was worth $2.5 million. On April 19, 2023, VICTIM-1 contacted an antique flag dealer, VICTIM-7, to ascertain the value of the flag. VICTIM-7 responded via email stating the flag's value was only

approximately $85,000. VICTIM-7 further informed VICTIM-1 that Youngblood did not have clear title to the flag since VICTIM-7 had sold the flag to Youngblood but had not been paid in full for it. An interview of VICTIM-7 and review of the email corroborated these events. VICTIM-7 stated Youngblood told him he would receive payment for the flag from COCONSPIRATOR-1's (CC-1) bank account. VICTIM-7's business was in Pennsylvania, and he received wire transfers from CC-1 in Texas. VICTIM-7 provided records of the wire transactions from CC-1 and screenshots of his conversations with CC-1.

23.    Based on the foregoing, there is probable cause to believe that Saint Jovite Youngblood violated 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956 (Money Laundering). Specifically, Youngblood devised and intended to devise a scheme to defraud multiple victims, and to obtain money from them by means of materially false and fraudulent pretenses and representations. This scheme was advanced through the transmission of wire communications in interstate commerce, including the transfer of funds from CC-1 in Texas to VICTIM-6 in Pennsylvania, and the social media posts and interstate telephone calls made by VICTIM-4 and VICTIM-5 on behalf of Youngblood. Similarly, Youngblood aided and abetted multiple financial transactions, including bank transfers between VICTIM-1 and INDIVIDUAL-1, knowing that the property involved in those transactions represented the proceeds of illegal activity, including wire fraud and extortion, and knowing that the transactions were designed in whole or part to disguise the nature, source, ownership, and control of the proceeds of those illegal activities. Based on my training and experience, I believe Youngblood used INDIVIDUAL-1, his bank accounts, and their appearance of legitimacy, to conceal the nature of the funds.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_Lindsey Wilkinson_
LINDSEY WILKINSON
Special Agent
Federal Bureau of Investigation
Austin, Texas

Subscribed and sworn to by telephone on this ___26th___ day of July, 2023.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE